*Barsomian v. Mountainside Condominium Association*, 174-3-16 Wncv (Teachout, J., May 17, 2018)
[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

**SUPERIOR COURT**                                                  **CIVIL DIVISION**
**Washington Unit**                                                **Docket No. 174-3-16 Wncv**

**JOHN BARSOMIAN et al.,**
    **Plaintiffs**


    **v.**


**MOUNTAINSIDE CONDOMINIUM ASSOCIATION,**
    **Defendant**


### DECISION
### Motion for Appointment of Receiver

Defendant Mountainside Condominium Association is the condominium association for a 90 unit condominium complex in Warren, Vermont in the Sugarbush ski community. The complex was built as three separate buildings. Plaintiffs are some, but not all, owners of the 36 individual units in Building 3.

Plaintiffs seek the appointment of a receiver for the Association based on claims that the Board of Directors has mismanaged its obligation to reconstruct Building 3 following a fire. A hearing was held on the motion on May 15 & 16, 2018, but by agreement of counsel, all evidence previously admitted at hearings on October 21 & 28, 2016 and January 4, 5 & 6, 2017 was also evidence for this hearing.[1] Plaintiffs are represented by Attorney Christopher D. Roy. Defendant is represented by Attorney Robert S. DiPalma.

### Findings of Fact

The Mountainside complex was built nearly 40 years ago. Many of the units are vacation second homes for owners who reside elsewhere. For many years up to approximately 2010, the governance of the Association was stable under the leadership of a single individual who served as President of the Board for thirty years. Since his departure, there have been several changes in the membership of the Board.

In February of 2014, a fire completely consumed Building 3. Under the condominium Declaration, the Board had the obligation to "promptly reconstruct . . . in substantial conformity with plans of record and the original plans and specifications for Mountainside Condominium with the proceeds of insurance available for that purpose, if any." (Section 10.1). If proceeds of insurance "are insufficient for that purpose, the Association may raise the remainder of the necessary funds by levying one or more special assessments in the same manner in which

---

[1] Evidence on all of those dates is evidence in the final hearing on the merits in Plaintiffs' claims for equitable relief, which has been separated from Plaintiffs' claims for damages, which will be heard at a later time.

assessments to meet ordinary common expenses are levied." (Section 11.2).

The circumstances were complicated. Over the years, many of the Building 3 unit owners had renovated, upgraded, and customized their units with significant betterments. Since original construction, building codes and land use regulations and construction technology have all undergone changes that would call for changes in what was to be built, making it impossible to rebuild exactly what had been lost. While the Association had insurance that included replacement coverage, it was initially unknown whether there would be a gap between reconstruction costs and insurance proceeds, although that was likely as there was a cap of $105,000 on costs attributable to upgrades required by codes and ordinances. Some, but not all, Building 3 owners had some forms of coverage of their own. Building 3 owners were obligated to continue to pay dues and in many cases mortgage payments even though they had no units. Building 1 and 2 owners had reservations about having to pay anything toward reconstruction of Building 3. Some, but not all, of all owners had loss assessment coverage (in differing amounts) to reimburse them for special assessments of the Association.

The Board initially went to work on the various issues involved. By June of 2014, there was a letter of intent with Engelberth Construction to rebuild the building on a design-build basis. The Board got legal advice on both reconstruction obligations and insurance issues and hired World Claim as its own private adjuster. To determine the costs of rebuilding the betterments of unit owners, World Claim gathered information and compiled a detailed inventory of what had been in each unit before the fire. An Act 250 land use permit was going to be needed, and an application was filed in September.

The Minutes of the Annual Meeting of October 12, 2014 include a lengthy description of details concerning progress on the multiple dimensions of the project. Besides being informed of the status of the many tasks and the work of Engelberth, World Claim, the project manager, and others, owners were also informed that "[i]f there is a significant difference between the re-build and insurance company offer, borrowing money or a special assessment would have to be considered." Owners were further informed that if there were to be a shortfall, owners in all buildings would be responsible for the rebuild, "exclusive of betterments and improvements inside units." The project seemed to be underway with the anticipation of starting construction in the spring of 2015. By January of 2015, Engelberth had completed preliminary plans.

Progress slowed down considerably in 2015. One factor was the necessity of obtaining Act 250 approval, which took time as the permit was initially denied and there was an appeal. In addition, there was considerable turmoil in the governance of the association. There were changes in Board membership, changes in attorneys, requests for changes in bylaws and for meetings and special meetings. The insurance claim against Vermont Mutual was in dispute. Construction itself could not really begin because of the status of the Act 250 permit, but during this period, considerable tension, suspicions, and mistrust, as well as disagreements over strategy, developed between board members and owners. Communication was poor.

The portion of the Minutes of the Annual Meeting of October 11, 2015 attributable to "Building 3 update" is short. The status of what insurance proceeds would be available was very unclear. Owners asked what the shortfall would be and "what each owner's financial exposure

2

would be." The Board said it was unknown.

In March of 2016, the Plaintiffs were frustrated and filed this suit and sought the appointment of a receiver. In April of 2016, the Act 250 permit was issued, so the project could proceed, but it remained stalled. No progress was being made in determining the amount of insurance proceeds that would be available. It was becoming clear that there would likely be a shortfall in available funds. Vermont Mutual was taking the position that Engelberth's plan was too expensive. Engelberth had been paid $440,000 and had preliminary plans, but Board members began considering whether to use a different builder and seek different plans, perhaps to reduce costs and pursue a more energy efficient design, but there would also be a cost to sever the relationship with Engelberth. Building 3 owners were nervous about changing plans from the Engelberth design, which they supported. There was also discussion about suing Vermont Mutual concerning its insurance obligation. Communication between the Board and the owners remained poor.

The Minutes of the Annual Meeting of October 9, 2016 demonstrate vagueness as to any plan for progress. There was the possibility of suing Vermont Mutual, and the Board was considering changing contractors, but there was no clear plan or timetable. The one concrete action that was taken was that the members approved a special assessment in the amount of $1.5 million to address the likelihood of a shortfall in available funds. Despite that approval and the ongoing recognition of a likelihood of a shortfall, the Board has never taken steps to proceed with the special assessment that was approved.

The hearing on the request for the appointment of a receiver took place on the dates described above. On the last day of hearing, January 6, 2017, the parties stipulated to the court deferring a ruling on the motion because at that time it appeared that progress was being made and that it would be possible to move forward with the project in a manner that would result in construction in the summer of 2017.

The Board changed contractors. It hired Naylor and Breen as contractor and an architect to revise plans. One result was a dispute with Engelberth over drawings and financial obligations, and the Association is now in a lawsuit brought by Engelberth seeking $325,000. Vermont Mutual paid $4.9 million for the value of the burned building, but there was no clarity as to what would be available for the reconstruction component and it appeared that Vermont Mutual was not likely to agree to the amount that would cover costs. Although construction started in the summer of 2017, the Board did not take any steps to cover a possible shortfall.

As of the time of the Annual Meeting in October of 2017, no action had been taken to implement the $1.5 million special assessment authorized the year before. Given that construction was underway, it was time to address the design and specifications for the rebuild of the individual Building 3 units. A specific board member was appointed to update all the unit owners' betterment claims.

In fact, that board member became unavailable, and that never occurred. Instead, a different board member began emailing Building 3 owners informing them of the choices available for flooring, fixtures, etc. and asking for information that many of them claimed they

3

had previously provided, sometimes on multiple occasions, and that such information is in the detailed World Claim inventory. The communication that occurred between the Board and owners on this issue over the next few months was very poor and contributed to increasing frustrations, mistrust, suspicions, and hostility. This atmosphere has continued unabated and was palpable in the courtroom.

Another contributor to the distrust was the owners' dissatisfaction with the way the Board has handled insurance funds. Instead of putting them in a segregated fund at the beginning, some such funds have been used to pay expenses such as the World Claim fees and other expenses that were clearly never covered by insurance. Owners believe there should have been budgeting and assessment for such costs and the insurance money should have been saved for building. The Board apparently took the position that these were fire-related expenses and it was not required to do so. It may not have been (the court takes no position in this decision), but the outcome was inevitable that at some point replacement money would be needed, and no steps have been taken to provide such funds. On the Board side, a board member began seeking loan financing in early 2018 without good results, and blames the inability to obtain adequate loan financing on this lawsuit, together with the fact that some owners have placed their dues in escrow.

On March 10, 2018, while construction was underway, the Board held an informational meeting for owners at which it presented some financial information. The figures are somewhat confusing but it showed the likelihood of a shortfall of at least $1.1 to $1.4+ million. The Board had gotten the Association into this position, despite knowing since 2014 that there could be a shortfall and despite not having acted on the authority for a $1.5 million assessment. Shortly thereafter, the Board learned from Vermont Mutual that it was not willing to release any more money without sufficient showing that prior funds had been spent on the building and that work had been incurred that called for such funds. The Board also was notified by the contractor, Naylor and Breen, that it was not willing to continue to the next phase of construction because of the lack of assurance that it would be paid and be able to pay subcontractors.

An important Board meeting was held on April 23, 2018. There was a real crisis at hand. The project was partially built but no money was available to continue and construction was about to stop. The transcript of that meeting shows that the first part of the meeting was spent discussing whether billing of dues should shift from quarterly to monthly in order to pay expected but unbudgeted attorneys' fees in the amount of $130,000. This might have been appropriate for a follow-up topic, but did not address the urgent needs of the Association, which was to address a shortfall of $1.3 to $1.9 million.

The discussion that followed about what to do about the financial crisis demonstrates a lack of ability on the part of the Board as a group to address the serious and complicated problems the Board faces. There was very little factual information presented. It did not appear that any meaningful homework had been done in preparation to establish priorities, assemble facts, obtain professional advice, identify options, or develop proposals. The discussion about whether to do an assessment was at such a level of generality that tough decisionmaking was not possible and did not occur. The transcript demonstrates that although the members of the Board are well-meaning and would like to fulfill their obligations, the group is simply not capable of handling the difficult circumstances that the Association now faces, and that have been created

4

by the actions or inactions of the Board over the last year.

The situation now is the following:
- Construction is about to stop midway due to lack of available funds
- The building has been framed; the doors are being installed; roofing materials have been ordered but are not installed
- There is a shortfall of $1.3 to $1.9 million to complete the project
- The members authorized an assessment of $1.5 million 19 months ago but the Board has taken no action to pursue it
- In over 4 years, the Board has never increased dues or made a special assessment to pay for expenses such as the World Claim fee ($160,000) that were not covered by insurance
- One bank has indicated a willingness to loan no more than $700,000 which would not be enough to complete the project
- It is over 4 years since the fire and 2 years since the necessary permits were in place, and there is no realistic completion in sight
- The Association is now involved in, and required to devote attention and funds to, three lawsuits related to the project: this one, the Engelberth suit, and one related to insurance
- The Board is now considering the possibility of simply building out the project to the "tenant level," which was not clearly defined but seems to mean that only the walls and structural elements would be done and the owners would be left to finish their units themselves
- The Board has demonstrated a lack of capacity to engage in effective decisionmaking in the context of a difficult multi-party, multi-faceted challenge
- There is a high degree of mistrust and hostility between the Board and many owners; much energy is spent on blaming and communication is dysfunctional
- Building 3 owners have had no units for over 4 years, yet remain responsible to the Association
- It appears that the actions of the Board over time have only increased rather than decreased costs, without achieving results, to the detriment of not only Building 3 owners but potentially all owners

The court finds that in order for the Association to fulfill its obligations to Building 3 owners and to manage the assets of the Association responsibly on behalf of all owners, the governance of the organization must be in the hands of decisionmaker(s) who have knowledge and experience with real estate construction, financing, organizational financial responsibilities, and insurance negotiation, and who have the necessary authority and willpower to make difficult decisions that will no doubt have a more painful effect on some owners than on others but are necessary to avoid loss to all owners. The court finds that the Board as currently constituted does not have the capacity to fulfill these obligations.

Thomas Lauzon has been proposed as a receiver, and has credentials that make him an appropriate person for the task. Moreover, he is independent of any personal interest or allegiance that could affect his decisionmaking. It is unnecessary to review his qualifications, as both parties accept him as qualified for the role. The Association would like to hire him as an

5

independent consultant in order to take advantage of his expertise. The court finds that the Board has had the benefit of many well qualified professionals over the past several years, but has been unable to function as a group to use the input of professionals in an effective and efficient manner for the benefit of the owners. For the Board to hire him would leave decision-making in the hands of the Board, and the facts set forth above demonstrate that in such a situation, the prospects for a successful outcome would be poor.

## Conclusions of Law

This court has the authority to appoint a receiver as recognized by V.R.C.P. 66, which is modeled on Fed.R.Civ.P. 66.

> The appointment of a receiver is considered to be an extraordinary remedy that should be employed with the utmost caution and granted only in cases of clear necessity to protect plaintiff's interests in the property. Factors that courts have considered relevant to establishing the requisite need for a receivership include the following: fraudulent conduct on the part of defendant; the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; the inadequacy of the available legal remedies; the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and, in more general terms, plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property.

12 Fed. Prac. & Proc. Civ. § 2983 (2d ed.)

In this case, based on the facts set forth above, the court concludes that the appointment of a receiver is necessary to prevent the Plaintiffs from ending up with the loss of any usable condominium unit at all, or with a partially finished unit that is worth significantly less than the unit they were entitled to if the Board had exercised its responsibilities properly under the Declaration, or potentially with liability associated with an interest in an unfinished and unusable building. Without decisive action in the near future, there is significant risk of substantial diminution in the value of their property, and no ability to occupy owned real estate.

Therefore, the motion is granted in part in that the court will appoint Thomas Lauzon as Receiver for the Mountainside Condominium Association with the full powers of the Board of Directors. He will be authorized payment at the hourly rate of $180, and he will be authorized to hire agents to assist him. He will be required to give a bond, and to submit quarterly reports to the court.

Plaintiffs also seek an order that the appointment last until Building 3 is completed, the financial affairs of the Association are "in order," and a new Board has been elected. The court declines at this time to set conditions or limits on the duration of the appointment.

6

**ORDER**

For the foregoing reasons, the Motion for Appointment of a Receiver is granted and Mr. Lauzon will be appointed.

The court will schedule a hearing to review with the attorneys and Mr. Lauzon the exact terms of the order of appointment.

The attorneys and Mr. Lauzon are encouraged to communicate in advance to determine whether terms can be agreed upon and develop a draft proposed order, or at least narrow any terms of disagreement.

Dated at Montpelier, Vermont this 17th day of May 2018.

                                        _____

Mary Miles Teachout
Superior Judge